Case No. 16-1433. San Diego Gas & Electric Company Petitioner v. Federal Energy Reservoir Commission. Mr. King for the petitioner and Ms. Manson for the respondent. Thank you, your honors. May it please the court, Kevin King for the petitioner, San Diego Gas & Electric. Your honors, two straightforward steps resolve the merits of this case. First, as FERC found in pages 8-9 of the appendix, the South Orange County project meets the criteria for the abandonment incentive, the nexus and reliability tests. Which is to say that the project, if built, would enhance the reliability of the electric grid in Southern California and that the abandonment incentive that we've sought here is tailored to the permitting risks and environmental risks faced by the project. Second, because the project meets those criteria, it is entitled to the benefit prescribed by the abandonment incentive, which is recovery of 100% of the prudently incurred costs of the transmission facility. No, the agency had no discretion whatsoever, even if there was no nexus. No, your honor, I wouldn't say that. The agency found here that there's a sufficient nexus between, on the one hand, the abandonment incentive that we've requested and, on the other hand, the environmental permitting siting risks faced by the project. But that's my point. As I understand your two steps, then the agency has no discretion, regardless of its view of the nature of the purported nexus. That's right. There are two steps. There's the reliability step, which it's undisputed was met here, that this project's going to make the electric grid a more reliable, less subject to blackouts in Southern California. And having done that, then the agency asked the question, and this is in 18 CFR 35.35D1, Romanette 6, which you can find at page A4 of our statutory and regulatory appendix. It asked the question, is the requested incentive here, the abandonment incentive, tailored to the risks and challenges faced by the applicant in developing the project? And FERC answered that question in the affirmative. It said, yes, this project faces real, substantial risks that it might have to be abandoned for reasons that are totally outside of San Diego gas and electric's control. At least in the orders, and I think it is clear in the orders of dying reconsideration, FERC says, sort of seems to do kind of a two-tiered nexus analysis. And it says, you know, yes, there is an uncertainty. There's facing uncertainty. But under the regulation, there's also this reference to tailoring the incentive to demonstrable risks or challenges faced by this applicant. And it seems that that's where FERC is saying, you know, the tailoring, the general type of risk is there's a risk of regulatory uncertainty check. But that doesn't exhaust the nexus analysis, at least as FERC is doing it in this case. And what's your response to that? Sure. So I think that does get right to the heart of the case, Your Honor. And our response would be that the regulation set out a two-part test for liability and a project-level nexus test. The nexus test does not look, as FERC's brief would have it, at each individual component of a project's costs. Instead, it looks at the risks and challenges faced by the applicant in developing the project. All right. You set aside the – I understand your argument about the project is the unit. And the argument is that if there are risks faced by the project, the project as a whole is subject to the incentives. If the risk – if there aren't the covered risks, it's not. If we were to rule against you on that and to read the language that the total package of incentives has to be tailored to address the demonstrable risks or challenges faced by the applicant in undertaking the project and were to read that as giving some leeway for this kind of treatment, other than the argument – I understand, and I'm not saying I don't agree, but just to analytically clarify, other than the argument about the project being the only unit that FERC can look to in granting the incentive, what would be your argument about why they couldn't have read this and didn't read the regulation that way here? So we hope you agree with us on the project. But even if you don't on that point, there are several other reasons why FERC is bound by its regulations and cannot do what it did here. And let me walk through those one at a time. To start with, the regulations expressly give utilities two procedural options to seek incentive rate treatment. The first is an ahead-of-time declaratory order petition of the kind that we filed here. We're going to seek incentive eligibility in advance. The second – and again, you'll find this in 3535D – is an after-the-fact Section 205 rate filing, where the utility comes in and it requests incentive treatment after a project has been abandoned for reasons outside its control. And so the regulations expressly envision that a utility can come in after a project has been abandoned, after all of its costs have been expended, and nevertheless get this 100 percent abandonment incentive. Not 90 percent, as FERC says in its free-for-all proportion, but 100 percent. Where does that 90 percent figure come from? The 90 percent is – and this is sort of – Because they took the amount that you – the 50 percent of what you had already expended and then compared that against the projected entire cost of the project? Is that the idea? I'll let my colleague for FERC do the math, but yes, that's my understanding of where FERC got that number from. And of course, it wouldn't be 90 percent if, for example, we had to abandon the project tomorrow or next week. Right. It'd be a much higher – I'm sorry, much lower percent. That's right, Your Honor. Yes. So, Mr. King, you argue that FERC's reading effectively eliminates the Section 205-only route. But as I read the regulation, the two procedural avenues are available for the whole list of seven-plus other incentives. And so, really, the question is, why isn't the availability of rate-making-only requests for incentives still material, viable, worthwhile, and not rendered a nullity, given, for example, that you might only seek accelerated depreciation in rate-making, but maybe for this kind of abandonment incentive, it makes more sense to – in fact, it might be required to seek it in a declaratory order. Well, I'd say a few things in response to that, Judge Pillar. First off, as you say, the two-tier structure, the reliability and nexus tests, and the Section 205 option and the declaratory option, all those apply to the entire list of incentives, which means all of the incentives, the seven-plus, may be acquired through either of those two procedural routes. There's nothing in the regulation whatsoever that says, okay, if you're going to seek the abandonment incentive, you've really got to take the first route. I agree that's what FERC was trying to say in its orders here, but that's inconsistent with the regulation. And that's the Christopher case from the Supreme Court. It says an agency is bound by its regulations. Here, as regulations say, when you meet the reliability and nexus tests, you get 100 percent. Instead, they're trying to give us 90 percent, as they say in their brief. That just won't wash. So I guess that's one response. Another response is that, you know, here we're talking about a sort of a fact-specific nexus test. That's what FERC argues in its brief, but that's not at all what FERC did in its orders. If you look at pages 19 to 20 of our reply brief, there's a series of bullets where we quote from FERC's opening order and its rehearing order. And you'll see in those bullets in 19 to 20 a series of statements that say, from FERC, 100 percent recovery is not available categorically prior to the date of a project-specific order. We are only going to allow 50 percent recovery prior to the date of that order. That requirement is nowhere in FERC's regulations. Indeed, it's flatly inconsistent with the 205 option I've described. It's flatly inconsistent with the project-level understanding of how the nexus test works. It's flatly inconsistent with FERC's own precedent as we develop in our brief. Let me just go back to this earlier point so I'm clear what your position is. Your point is once the criteria in terms of reliability and nexus are met, you get your 100 percent. The client is entitled to the 100 percent. And you're saying the nexus test is limited by, I need to be clear about this, the precise words in the regulation, even though the discussion of the regulation says the commission is not setting out specific factors. It's going to look at this on a case-by-case basis. And I know your argument about that's completely contrary to what the statute was talking about and what FERC did in responding to Section 219, but I just want to be clear about that. That's why I wanted to be certain that you see FERC has no discretion after it makes the first two findings. I appreciate the question because I think it actually will help clarify exactly what we're arguing here. We're not arguing that FERC has no discretion. Indeed, FERC has significant discretion in applying the nexus test, but it has to apply that test in a manner that's consistent with what the regulations say and consistent with what FERC has said about it in the past. So, for example, it's not just the regulation, but if you look at Order 679A, Paragraph 21, you'll see there FERC, on rehearing Order 679, was expounding on, well, what does this nexus test mean? What is the structure that we're going to apply on this case-by-case basis? And what it says is, and I quote, the nexus test evaluates, quote, how the requested incentives address the risks and challenges faced by the project. Okay, so here FERC says, your client acknowledged that it was going forth with this project without any, I don't know if I used the word guarantee or assurance, that it was going to qualify for the 100%. That's right. We did say we didn't have any assurance, but the context for that statement is important. We didn't have assurance that we'd be able to recover the cost through our rates because we didn't have any assurance that, for example, the California Public Utility Commission would give us the Certificate of Public Necessity and Convenience we'd need to build it. So we weren't talking about the abandonment incentive when we made that assurance. That's after your project was included in the state plan? It was after we were included in the California Independent System Operator Plan, which is a different body than the State Public Utility Commission. Right, but, I mean, the state, in effect, had acknowledged that this was a plan that would come within the whole purpose of the statutory revision. I'm not sure I agree with that. The California Independent System Operator had said this is the type of plan we need to improve the electric grid in Southern California, but the state commission… But that triggers the reliability-related. It makes you eligible under the reliability-related factor, but it doesn't remove potential abandonment risk. That's absolutely right, Your Honor. The abandonment risk is still very significant. It's worth recognizing. Now, what about now? Because I understand that California has made the approval, but there's still some local and quite vehemently opposed localities that need to be cleared. What's the status right now of the risk? So I'll start with what's in the record, and then if the court allows, I'll go outside the record just to give you facts that bear on what's going on right now. So to start with what's in the record, there are a series of permits that are necessary for this project to go forward. Some come from the state of California, from the Public Utilities Commission. Others come, for example, from the city of San Juan Capistrano, where the project is located, or under the National Environmental Protection Act. I hope I'm getting that right. Because part of the project crosses the Marine Corps base at Camp Pendleton. So now I'm going to go outside the record. That's what we said in advance, and the briefs do show that we got the permit from the State Utility Commission. The city of San Juan Capistrano, where this project is located, where we're going to improve the substation, they have sued the Public Utility Commission in federal court challenging the grant of our permit. So let me ask you, Justice Counsel, sorry to interrupt, but how can we rely on any of this? It's not part of the record. That was before the agency. You could look at this only if you were thinking about standing or something other than the merits of the case. You can look outside the record for standing. But I didn't think that was the nature of Justice Sullivan's question. Is this within the city limits of San Juan Capistrano? I believe it is, although I'd have to check with my client. I'd be happy to file a 28-J letter. That's a kind of quaint little city right on the Pacific Ocean, right? I didn't think there was any room for a transmission facility there. I think you'll find if you look at the case that I mentioned is now in the Ninth Circuit, number 17-56693, and you'll see that there are arguments to that effect in the briefing in that case, Your Honor. What I'm trying to focus on here is that in any project, there are risks as to whether you will get the necessary permits and authorizations that you need. So can it be that any project that is included in the state plan is going to be eligible for the abandonment recovery? The answer to that question is yes, Your Honor, because the plan is not the state's plan. The plan is not the plan of the entities giving out the permits. The plan is of a different entity, the independent system operator. And I would say here FERC made a finding. It is 89 of the appendix that this particular project stands apart from other projects because it faces special and substantial, I think is the word FERC used, permitting risks. Mr. King, before you sit down, there's one thing that sort of puzzles me. Maybe I should save this question for the commission, but I'll pose it to you. The commission asks for our efforts in interpreting its regulation. And I've looked through the regulation, and I don't find any ambiguity that they're interpreting. I'm looking at the regulation now. It says that an incentive-based rate allows recovery of 100% of prudently incurred costs of transmission, et cetera, et cetera. If the facilities are canceled or abandoned due to factors beyond the control of the public utility, what ambiguity is FERC interpreting there? I think that there's none in our view. The regulation is unambiguous. When you meet the two tests, as FERC found that we do here, you get 100% recovery, not 90% or 78.4%. Just following up on the question I had about the permitting, one of the questions I have is were you happily to get that final approval, do a NEPA analysis and have the city of San Juan Capistrano give you the go-ahead? The case would become moot, would it not, because this is about risk of abandonment based on factors beyond San Diego Gas and Electrical Control, and if the kinds of hurdles that the regulation speaks to fall away, then you're not going to need it anyway. That's right. The case could become moot at some juncture, but I would submit way off in the future because here we are. We're in a fight in federal court in California over whether our permit is valid and whether there's going to be an injunction to stop us from building the project. But years down the road, there's the NEPA process, so it's going to be a long time. This is a gigantic project, a $300 million investment. So if there ever were a day where this case could become moot, it's way off in the future. But really what this case is about goes to Judge Randolph's question, which is an agency is bound by its legislative rule. We understand that. You've briefed that really quite well. The other question I have is about remedy. If you prevail, what's the scope and implications of that as you see it? Every other transmission investor that has been only given order, you know, eligibility for this abandonment incentive from the date of their declaratory order forward, all would be subject to the same treatment. I think if there are cases still in the pipeline that haven't reached a final non-appealable judgment, this court's interpretation of the regulation would apply in those cases. So, for example, in the cases involving our interveners, Pacific Gas and Electric, Southern California Edison, they have cases that are at the rehearing stage before court right now. If this court were to agree with our interpretation, we hope it will, it would apply in those cases. But if they're cases from three years ago, no, it wouldn't apply in those. What if we thought that FERC could interpret the regulation the way it says it has, but that it hadn't been sufficiently clear in giving you notice of that fact? Then the remedy might be more nuanced or not. I think if FERC has departed here from what it did for a decade and all those prior orders that we cite, the remedy would be vacatur and remand. For you. I'm sorry? For you. Yes, for us, that's right. But not of the rule or? I don't know as a rule for other cases. No, I'm not so sure. It would depend in the other cases how much notice that the other parties had. And this is, again, just assuming argument that you don't agree with our interpretation. Right, you're more general. It would be an us-only type remedy, yes. All right, why don't we hear from you. Good morning. I'm Carol Banta for the Commission. Before I sit down, I do want to get to the question about the 205 proceedings that Judge Pillard was asking, but I think I'll start with talking about the regulations. And I'm looking at the full version that's at pages A8 and A9 of the addendum to FERC's brief, the unedited original GPO, I guess, version. To be clear, before we get to the 100 percent language in D6, D6 is the list of all the different incentives that are available under D. So we begin with the main body of D that says, the Commission will authorize any incentive-based rate treatment as discussed in D6, provided that the proposed incentive-based rate treatment is just and reasonable and not underlegal discrimination preferential standard 205-206. And it goes on to say that the burden is on the applicant to explain how it fits and to demonstrate those risks and challenges. And then it says that the applicant must demonstrate that the total package of incentives is tailored to address the particular risks and challenges, and that the resulting rates are just and reasonable. And I'd also go back to, if you look up at Section C of 35.35, again, all rates under this have to be just and reasonable. That's also in the statute, Section 219D, which is on A6 of the addendum, and just another overarching principle that's in both 219A and 35.35A is that the purpose is to Just and reasonable rate, according to the regulation, allows for 100% recovery of prudently invested or spent funds in a project that was abandoned through no fault of the utility. From the time the incentive is granted. No, it doesn't say that. Where does it say that, from the time of the order? Well, it says from the very beginning that no incentive from Paragraph 1, the rule doesn't grant any incentives to any public utility. It will allow them when justified, but you do have to ask. You have to come in. But I would also point the Commission, or point the Court, to Paragraphs, I believe, 21 to 26, but particularly 26 in Order 679, where the Commission is talking about the entire reason for these incentives and that not every incentive will be available for every new investment. And it goes back to what I was saying in 219 and 35.35, that the purpose of the incentive is to benefit consumers. And in Paragraph 26 of Order 679, the Commission talked about how we believe these incentives... I would suppose that when a, like San Diego or any other company, makes an investment decision, they're doing it on the basis of the prospect of earning a profit. I mean, why else do it? So the incentive is recovering 100% of the cost of the project. That's the incentive, and that is derived not from an order of FERC. It's derived from the regulation, and it's also derived from the general rate practice that if you prudently invest a billion dollars, that's going to be part of your rate base if the thing is up and running. And the Commission's policy has for a long time been, if it doesn't get up and running, the cost recovery for that is 50-50, which is another thing that the Commission decided, balancing the interests of investors and consumers. Where's the 50-50 in this regulation? Well, no, it's the existing... Well, show me the 50-50 in this regulation. It still exists, and I... Well, we have a regulation, because there is a statute that required you to promulgate it. Well, it's for incentive, but 50-50 was never an incentive. It's basic abandoned plant cost recovery that still exists. I would... Ms. Banta, in the order, you were pointing us to the orders language, and it seems like a lot of the... I mean, the entire rationale for the limitation imposed here is that an incentive is only functional as an incentive if it precedes the incentivized conduct or if it's assured before the incentivized conduct. It seems like, as you've articulated, the logic of that limitation, it's actually quite categorical. In other words, an investment that's made before an order securing the abandonment incentive is inexorably not going to be subject to recovery. And I know in your brief, you go on and you say, well, there could be circumstances in which it would be. Can you tell us more about that? Because it's hard to see, given just the logic of the position about, you know, you don't know until you know, so you've got to come ask, and when we tell you the answer, then you're going to be incentivized. And I'll give you a couple of examples, but I do want to point out that in this case in particular, the commission was particularly focused on the facts before it and mentioned I think four or five different times in the rehearing order that this is a case where it was four years. So it's not one of those cases where it's maybe 60 days, and they're asking for the date when they filed or they're asking for some other date. The commission left the door open to consider that in appropriate cases. But when you say case by case, you have to have in mind a category of reasoning that would make a difference in a different case. And so I'm actually trying to probe that. What is a good example of a case in which somebody exercises only the Section 205 rate-making procedural opportunity to request an abandonment incentive, and it would be granted? I'll give you two that the petitioners have cited many times, although not for that. Neat-West and Alit, those two cases that they cited, A-L-L-E-T-E. To be clear, and I know this has been confusing, the 205 and Judge Pillard, you hit on this exactly with the overarching comment in Order 679 going to all the different kinds of incentives, the construction work in progress, various other costs that you can get during the course of construction, things like that. So the commission said you can do a declaratory order or you can do 205. Construction work in progress, could you even do that by 205, or would you have to do that by declaratory? Construction work in progress. Well, it's the opposite. You wouldn't get much from doing declaratory because you don't get to put in your rates until you do 205. So the examples I cited, the Neat-West and Alit, I'll give you the details on those cases. Both of them, they were not petitions for declaratory orders. They were both Section 205 filings, and this is not the 205 filing at the end when something has been abandoned. This is the 205 filing to implement incentives. In the Neat-West, next to Eric, case, that was a Section 205 that in addition to asking for the abandonment incentive, if that happened, if at that point it hadn't been abandoned, they were asking for it going forward, and they filed their 205 filing two and a half months after they got approved in their regional plan. They asked for abandonment. They asked for pre-commercial expenses. They asked for a hypothetical capital structure. They asked for a return on equity and a regional transmission organization adder. The commission actually denied the return on equity because it was disputed by rate payers, so it didn't even get all the incentives it asked for, but it did get the other four. In Alit, I think they filed fairly soon after their approval in the regional plan. They asked for abandonment and construction work in progress. My question is how in Neat does the commission contend with the rationale that it imposed on San Diego Gas and Electric and distinguish its grant of the abandonment incentive in that circumstance from a partial denial of it to San Diego Gas and Electric? And I think, first of all, it didn't address the merits of it because nobody protested the abandonment. Nobody raised that issue. There was no record there what costs were before or after. There was just no discussion of that. Neat West put the language in their request that they get the two-and-a-half months. Again, they filed very soon after they met the reliability nexus of signing this agreement with the regional, who it was. They signed very soon, but there's nothing at least mentioned in the order about what costs they're talking about, what they have already spent by that point. No rate payer contested that, whereas I think the state disputed one of the other incentives and the commission gave it, and then a variety of parties disputed the return on equity, which the commission discussed at length. So is the commission's position that where nobody protests that it doesn't have to apply that limitation that is, in its view, based on a policy inherent to the nature of an incentive, that it should only become available after it's been sought in a declaratory order? No. The dividing line rationale? I think not. I mean, the commission answered a similar challenge in the PJM2 case, but until these orders, I think the commission hadn't really grappled with exactly how the rationale for incentives and the general policy rationale should be. And I think it has been consistent afterward. But in many of the early cases, they were declaratory orders that were filed very soon in the process when there weren't a lot of costs, and no one was disputing whatever those costs might have been. Is there a prerequisite to filing a Section 205 that one of two things has occurred, that the project has formally been abandoned or that it's up and running? No. Because, as I said – So you can file a 205 halfway through construction? At any point. And the commission did, in footnote – oh, I'm looking at the wrong thing. In these orders, there's a footnote in the recurring order at day 22 and day 23, where the commission says that these kinds of incentive orders can still be useful later in the process. But the cases I cited, the Alit and Neat West, were 205 filings made early in the process. They wanted to be able to put construction work in progress. And in Neat West's case, things like hypothetical capital structures. Because going back to the other – the larger list of incentives. Justice Douglas once said, in an opinion, that footnotes don't really count. And he said it in the footnote, by the way. I do remember that. Well, this wasn't so much a ruling as just dealing with one particular argument. But, I mean, I could – it may not be clear here because this isn't a 205 case, but there is discussion of it in 679. And, again, I point to cases where they've done it. They came in with only a 205. It's early on. You can – construction work in progress, for example, is an incentive that you can start collecting money now while you're still building. You don't have to wait until the end, the traditional 205 at the end, where it's used and useful and you capitalize everything and deal with that. All right. So counsel for petitioner mentioned 679A. All right. And how do you distinguish the language there? For example, in paragraph 23, the commission reaffirms that the most compelling case for incentives are new projects that present special risk. All right. So the commission finds this is a special risk project. So it doesn't say anything that you have to have an order at some point before you qualify. Well, it says throughout that you do, but I would add about – No, it doesn't. That nothing is granted until – and the commission said we'll make it as easy as possible. You can do a declaratory order if you don't want to do a 205. I would add that that language in paragraph 23 was actually eliminated several years later in a 2012. It's not an issue here, so I think it didn't get cited, but there was a 2012 rulemaking that eliminated the routine and non-routine distinction. You see something about non – it actually extended incentives to investments that might have been considered routine. That actually is wrong now. All right. All right. So that certainly is reinforcing petitions, aren't it? Well, no. If you flip to the next page, paragraph 25 continues on to the next page, and it talks particularly about incentives are not provided in circumstances where they do not materially infect – infect, sorry – affect investment decisions. And I would point to something that the commission cited in both the declaratory order and the recurring order. Let's just deal with that. I think that maybe the – at least in my mind, one of the ways of looking at this is that if you don't get 100% recovery after an abandonment and you're thinking about making your investment decision, that's a disincentive to invest if you don't get 100%. Or it's an incentive to ask for it as early as possible. So in the – to give a determination. You can ask for it very, very early and it's still not going to recover 100%. We don't know that. Well, how can you meet the reliability and nexus test without at least preliminary drawings and work and analysis and so on and so forth? You can't possibly do it. And that's very expensive stuff. Right? It can be, but I would point to – and I would point to language in 679B, which was – we're hearing 679A. Paragraph 115 – I'm sorry, not B. It's 115 – paragraph 115 of Order 679A that actually says that – Which paragraph now? 115. It's in the section on construction work in progress, but it also calls back to the – it draws in the abandoned plant issue. 115? 115, yes. And it says, we clarify that – okay, the first sentence is not it. The second, these are rate treatments which may be needed and requested in advance of a project being approved through a regional planning process or receiving a necessary siting approval. Your – 115? 115. On that slide, it's on – I don't know what version of 679A you have, what page that would be, but on the FERC version, I've got it at page 82. Which sentence are you reading? It's the second sentence. It's after the footnote 186. More importantly, these are rate treatments. 679A. If I said B again, I'm sorry. Oh, okay. But I have a slightly separate question. Your brief, and to some extent I think the orders here, characterize this period of recovery issue as an application of the nexus requirement. Is that your position, that it is an application of the nexus requirement? Yes. Could I expand on that a little bit? Because I wanted to get to this before. And the commission, in discussing the nexus in the rehearing order, as well in the declaratory order, specifically cited language from a 1992 policy statement it put out on incentive rate making. This is how the commission has looked at incentives for decades. And it's – When the Congress comes along in 2005, all right, and directs the commission in Section 219 that what's been going on hasn't worked effectively. Right. I'm sorry. You were saying in the reconsideration order, what were you saying? These fit together, actually. Oh, it's cited in the recurring order at paragraph 4, footnote 6. But I can pull these two questions together. In that 1992 rate making, or policy statement, the commission said incentive rate making must be prospective. Here's what's important. Incentive rate making is not designed to reward past efficient cost-saving behavior. To do so would violate the objective of benefiting customers. Because this is always a balance between the investors recovering their money and the rate payers having to pay it. And that's what the commission was talking about in paragraph 26 of Order 609. But to go to your question about Congress, Section 219, which is at page A6 in the addendum to FERC's brief, Part A, the commission established by rule rate treatments for transmission for the purpose of benefiting consumers. 219 is about benefiting consumers. The commission echoes that in Section 35.35 and says it's about benefiting consumers. So the commission is saying we have thought for years that giving money to investors for past decisions does not incentivize behavior going forward. So to benefit consumers, you have to, and this is why this is very nice, materially affect those decisions. But you've done that in NEAT. You've done that in Republic Transmission. I mean, there are other cases where that putative lack of benefit to consumers was just, the commission appears to have just blown by it. And I'd be particularly interested in hearing about the cases since the orders in this case where the period of recovery issue was not addressed as part of the NEXIS analysis. I mean, in Republic Transmission, the commission appears to have just gone back to treating the period of recovery issue as a policy inquiry and doesn't really even have language linking it to the NEXIS requirement. And I'm just wondering how you reconcile the commission's treatment in those cases with the treatment here. Well, and I think it's – that's where – in the orders here, in the rehearing order, and I think it's the – I'm focusing less on the rehearing order than on what's happened since then. Oh, yes, but they're following – In other cases. Yes. They're applying a general policy rationale, and I think they may or may not have used – I think they used that word. They're following the general policy rationale that was elucidated in this case. And I would say, particularly in the rehearing order, maybe paragraph 16 and 22 are the places that best try to draw the idea of the NEXIS under the regulations with our theory of how incentives work and when they benefit consumers. Now, again, all of those – the subsequent cases, except Republic, which nobody thought were hearing if I'm remembering the right ones, those are pending on rehearing. And if someone wants to raise an issue about why they should be an exception to that policy, the commission will consider it. Nothing is ironclad when it's a policy, but it's a case-by-case, just and reasonable determination. Exceptions can be made. What does that mean, case-by-case? Every case is case-by-case. But what are the principles that are governing whether the commission, in its wisdom or discretion, is going to award 50 percent versus 100 percent? What are those principles? Well, and it's not – it's about awarding the 100 percent because the 50 percent is the default that you get regardless of what's happening here. That's – it's not an incentive. It's just cost recovery. But the commission looks at the project. It looks at the risks involved, and I'll give you an example of that in a minute. But depending on the incentives, it could also be risks particular to the developer, like hypothetical capital structure. Not every utility is going to qualify for that because the commission intended it to be for consortiums, multi-developer, or competitive developers who aren't incumbent utilities. You have to show that it fits your situation. Now, the facts the commission had to go on here is – How about pre-operational costs? If you could make – first of all, you come in as early as you can. Well, pre-operational costs is pretty much every – I mean, all of the incentives are pre-operational because they're construction and such. But I lost my – oh, I was – Is there a regulation saying that? Which? Say which? Oh. Yeah, recovery incentive-based rate treatment. It shouldn't mean recovery of prudently incurred pre-commercial operation costs. Oh, pre – right. Pre-commercial. I think that does include some – I don't know exactly how that one's applied. It has to do – it has to do with creating a regulatory asset, and then you get into some rate accounting. But – Let me ask you a few – Go ahead. You can finish answering. One of the things I would point out in the subsequent orders, in the PG&E order, although it is pending and recurring, I would point out that they requested abandonment incentives for eight projects, and the commission actually denied it as to five based on specific considerations of the particular risks and really how risky those projects were. So that's another way that it comes case-by-case. You're saying it wasn't prudently incurred? Oh, no. They hadn't been incurred. These were earlier. It wouldn't be prudently. It's not about prudently incurred. It's that the particular risks they faced just weren't that – I remember there's a word – moderate risk was in one of the paragraphs. But it's all in that order where they granted three and denied five based on the specific risks and challenges that had been shown. I'm sorry, Judge Miller. I had a pair of questions. One is, you know, we typically afford our deference to an agency's interpretation of its own regulations, but we are attentive to whether the regulated party had noticed that the rule might be so interpreted, and I wonder if you could help point us to where San Diego Gas and Electric would have noticed of this particular aspect of the Nexus test in advance of these orders in this case. Well, again, I always go back to the commission saying that nobody is entitled to an incentive until you come to us in one of these various procedural avenues that we're giving you. I mean, the regulatory materials supporting this rule talk a lot about things like you actually have to show that the reasons the project's abandoned are beyond your control. You have to show that this is something about, you know, reliability or lowering costs to consumers, the things that are focused on. And indeed, one thing I'd be interested in your views on, paragraph 28 talks about the incentives being designed to reduce the risks of new investment by providing assurance of recovery of abandoned plant costs. And then it says, although this qualifies as a quote incentive under section 219, it is perhaps more appropriately characterized as a reduction of a regulatory barrier, the potential lack of recovery of costs to infrastructure development. So in a way it's saying it's not so much that we necessarily see this functioning strictly as an incentive, but removing something that has been an obstacle in the past, which seems, again, maybe to, you know, if you're San Diego Grass and Electric, to muddy the waters on whether this crisp incentive-based reasoning that you then adopt in the order is the kind of reasoning that they would have reasonably anticipated. Well, and I think I look again at paragraph 26 of 679, which says each incentive will be applied in a manner that is rationally tailored to the risks and challenges. And then it says not every incentive will be available for every new investment. It's just at a very high level of generality. Everything you're pointing to just doesn't get in close to this terrain. Let me ask you a follow-up question, which is the flip side of what I asked your opponents. Were we to disagree with you or were we to find that there was a problem here, what do you think the appropriate remedy would be? Since it's a case-by-case determination, I guess the Commission would have to look again at this particular case. Or maybe given that it really explained a policy rationale that isn't new, that is drawn on older things, I don't know exactly what the Commission would have to do with that. But all of 679 was couched in this was going to be case-by-case and you have to come ask for it. We're making it as easy as possible. We're going to be easier than we used to be because we have these new incentives. And they largely have been. And I don't think we have any example of a case where someone waited four years. So maybe there's a case where the Commission has to do that. Well, you have examples where someone waited to do the rate-making, but they did the rate-making early in the project. Is that what you're saying? Well, you were saying meet with just a 205 filing. But the order refers to a subsequent 205. Right. So I'm a little bit confused, frankly, about the process. Right. I think you still do a 205 at the end when the project is complete or a 205 at the end if the project is abandoned. But you can do under Order 679, you can do a single issue or these incentive rate-making things where you can start collecting construction work in progress. You can start having the regulatory asset for the pre-commercial expenses. The Commission talks about how this can give you increased cash flow, lower interest rates, rate stability. One of the cases talked about not having rate shock on the consumers when they get to the end of the project and suddenly put the whole thing in rates at once. There are a lot of reasons to put it into the rates as you go. And I would like actually another example of someone who waited for different reasons. The one case I can think of where someone waited too late. We cited it in Commonwealth Edison. A party came in. It did get some incentives for some projects, but the key part that we cited, it came in with two projects it had already completed and said, well, you know, can we have those incentives now for the projects we already completed? And the Commission said, that's not an incentive. No, you can't. Not the abandonment incentive. What's that? I'm sorry. Not the abandonment incentive. No, they had been completed and they wanted to take advantage of the increased return on equity and some other incentives. So the Commission said from the start, Congress wants us to create more incentive rate treatments to benefit consumers. Here are a bunch of them. Some of them will work for you. Some won't. As I cited in cases, some parties just seek abandonment. Some seek abandonment and construction work in progress. Some want the whole thing. They want the capital structure and the return on equity and they want all of it. I do get the impression that this bundle of incentives, I mean, not everybody gets the ROE. Not everybody gets accelerated depreciation. Not everybody asks. Exactly. It's a little confusing to think about how any of them operate as an incentive per se if often they are having accelerated depreciation, for example, which is maybe just I choose that because it's one of the easier ones to understand. One could, after the project is up and built and supplying power and rates are being charged, one could seek accelerated depreciation going forward, no? Would that not be? Whatever. I mean, they'd have to show. It has to be influencing some decision. That's taking the incentive. And the reason that they're not all at the outset like maybe you want the abandonment one is that maybe you don't care about construction. Now I'm thinking it's construction while in progress. We call it QIP, but, you know, acronyms. You don't need QIP until you start construction. So you have more of a timeframe that you could consider whether you're applying for that. Some apply for it up front because they know they're going to want it, some of them. But as the commission said here, yes, San Diego waited four years, and we don't have another case like that. But at the point when they came in, the real heavy spending, the $350 million to $400 million, was still prospective. So they got the abandonment incentive for the decision to go forward with $400 million worth of risk. So when are some of these other ones requested? Like if I'm constructing some transmission infrastructure and I want accelerated depreciation treatment, when is that sought typically? The commission left it to the utility. When did it functionally, when did it make sense? It certainly makes sense before construction. As a practical matter, in the cases that I've looked at, they tend to come in pretty soon after getting the approval in the regional plan. And they'll do a whole package? They'll do hypothetical capital structure then and ROE? And the commission said you don't even have to do them all at once. We encourage you to do them all at once because we do consider them as a package. Well, and they seem like several of them are overlapping. Yeah, abandonment and ROE can play off each other. You don't get the higher ROE for how risky your project was. We suggested that you may not get the higher ROE in that case if you also got the abandonment. But I'm just looking at some cases. PJM2, they had abandonment, ROE, and QIP. The DCR case, which was a declaratory order, they came in pretty early. They wanted abandonment, pre-commercial expenses, hypothetical capital structure, and the RTO adder. And you said this is typically early before construction. In these cases, it happens. They come to the table and they say, look, we want a package. These are the kinds of things we think we're eligible for. And that is formally a rate-making? It is. Even though there's no power being supplied, there's a rate at issue? That's exactly the point. How does that work? That's exactly what 679 is about. It used to be that you got a lot of these costs when you met the so-called use and useful test, when it's done and it's ready to go. And because Congress wants us to give incentives for the investment, we're letting you take some of these sooner. If you come in and show that it's having a motivating effect, that it influences the decision that you're making. And we left it to the discretion of companies, but I don't think it's odd that most of them come in pretty early. It's kind of a workout. I mean, people come in. It's like you're doing a deal with them. And they're saying, look, we'd like to do this. The market is a bit tough right now getting investment. Can you help us out with a hypothetical capital structure treatment? And you all sit at a table and figure that one out? I don't think that's how. No, they file something. They make a case on the record for what their risks are. And the various interested parties, their state regulators, their rate payers come in and say, you know, or they don't come in because they're fine with it, or they come in and say, wait a minute, no. And it isn't always about the costs. I can give you an example. One of the cases – my notes are all confused. Either the Edison – I think it's the Edison III case. One of the cases that the petitioners said, oh, no, people did complain about the abandonment incentive. Well, they didn't complain about – what they said – I think it was Edison III. They – at the declaratory order stage, their rate payers came in and said, no, wait. If this thing gets abandoned, it's going to be their own fault. So it was actually that they didn't think that – Do you know whether when a company enters into or starts planning, they obviously have to have debt financing for the project? And do you know whether the bank or the other lenders require an early appearance before the commission to make sure that the nexus and reliability tests are satisfied? And they have nothing to do with the 100 percent, 50 percent time of order or anything else. It may be just the financing. Do you know whether that's true? I don't know. I have – I mean, it does appear in the petition. And there's nothing in the regulation that deals with that, with financing, right? Well, no. The commission – the reason the commission created this declaratory order procedure was to give you upfront certainty to help with financing early on. And I did quote that language from 699B that said, maybe you can even come in before you meet the standards. I'll give you an example of someone who did. Well, I think your time is right. You're way over. Okay. Anything, though, that is key that you need to make a point of here? No. Well, yes. I just wanted to close by focusing on that the commission is having to make a just and reasonable rate determination based on what benefits consumers. And it says that incentives that incentivize you going forward benefit consumers that are worth making the rate payers share the cost with investors or take them on. If someone gets the abandonment incentive and then during the inquiry into just and reasonableness, is it ever – is there authority on the part of the commission to pare that away or pare it back because it's not considered to be just and reasonable? No. Or if something's met the next requirement, it's not going to be found not just and reasonable? If the commission finds it's incentivized, it's going to give that. And the question of whether the costs were a good idea is the prudently incurred. Right. But I'm asking about the general sort of – to the extent that consumer interests are looked at at all with respect to the abandonment incentive, is it in the application of the three-part test in this regulation or is there a later time when that is revisited? Well, I think it's in this – certainly every just and reasonable determination would consider the rate payers. So it will be involved in the prudently incurred, but I think it does principally come in here where we're saying does granting this incentive-based rate treatment benefit consumers in this instance. So it is the upfront determination, I think. Okay. Thank you. Thank you. All right. Counsel for petition? Your Honors, if I could, five points I'd like to get to quickly. But Judge Pillard, let me start with that last point about whether incentive eligibility would be revisited at a sort of a post-abandonment 205 filing. The answer is no. That's in paragraph 77 to 78 of Order 679, which explained that the commission is not going to revisit the eligibility, the application of the reliability and access to that juncture. FERC's counsel adverted to its policies from 1992 or its longstanding policies. The policies that count here are the ones set forth in its legislative rule, Order 679 of the Incentive Regulations, which state that when a project such as ours meets the reliability indexes test, it gets the prescribed 100 percent benefit, not 90 percent as FERC says in its brief. Counsel said, well, you know, you haven't spent most of your money yet. You haven't built this project. You're going to get a recovery for that. But that's not what the regulation says. And it's a really important principle, not just in this case, but in all of this Court's administrative law cases, that if an agency wants to change position after a presidential administration or anything else like that, it has to go through notice and comment rulemaking to do so. And until it does, it's bound by its legislative rule. I would point out also that Paragraph 1 of Order 679 says, this final rule is designed to promote investment in transmission infrastructure development. I'd like to go back to a former point. The Commission says we've had this general policy, and we've defined incentive as a forward-looking determination. So now there's nothing new, as it were, in 679, except you may be eligible for this 100 percent abandonment incentive. I think, actually, there's more that's new than that, Your Honor. If you look at Paragraph 24 of Order 679, it says, we recognize that our past policies, including, among other things,  You think that's Paragraph 24 of the original order? 24 of 679, yes, of the original order. It says we need to go past and change and modify and update our policies, because that's what Congress told us to do in Section 319 of the Federal Power Act, and because transmission investment was declining under the old regime, the regime that counsel referred to. It had fallen, I think, remarkably down below 1975 levels, notwithstanding that demand on the grid had doubled since that time. So there was a need to change and do new things and be more expansive in giving incentives. That's what Order 679 is. So why wouldn't your clients have come to FERC earlier? We came to FERC using the options that they gave us in Order 679, the declaratory order options. It's a matter of, just so I'm clear, it's a matter of notice. In other words, if they'd said, nothing happens before we issue the order, you would have been in there immediately. That's absolutely right. But they had not said that anywhere. You know, what they said in their rule is you have the option. You can come in ahead of time on the declaratory petition or after the fact on 205. If their legislative rule had said you've got to come in right away and you're not going to get 100 percent until after we say the word, we would have come in right away, but that's not what their regulations say. The argument that it affects your cost of capital would seem to also be an argument that if it really were affecting your cost of capital, you would have come in earlier. I mean, presumably you have been lax with respect to obtaining lower cost capital during those four years and therefore imposed that cost on rate payers by not going in earlier and getting qualified for the abandonment that would therefore have entitled you to lower cost of capital. Well, I guess, Your Honor, we came in very early. This project has not – construction had not started in 2015 when we came in. As counsel mentioned, the overwhelming bulk of our costs were out in the future. That's more their position. They say you've got most of your costs. What are you talking about? You know, if it's so early, then no harm, no foul. Well, they say, oh, you know, you've got 90 percent. That's pretty good for you. But the reg says 100 percent. No, I understand. And we did come in, I think, you know, pretty early here. But the other point is we started development on this project in 2008, right? The incentive regulations went into effect in 2006. If you look at paragraph 11 of David Geier's declaration attached to our hearing brief, you'll see we were aware of the abandonment incentive when we started on this project in 2008. We were relying on its availability, and we knew that we met the criteria. And lo and behold, we were right. We do meet the criteria, which means that we get the benefit. So I think, you know, we were relying, our investors were relying on our eligibility here. So I think that's one key point. I just want to double back on this 1992 policy statement that counsel referred to. If you look at paragraph 53 of Order 679, it says expressly, and I want to quote here because this is important, that we will not require compliance with the 1992 transmission policy statement as a precondition for approval of incentives. But more fundamentally than that, counsel's argument misperceives the source of the incentives, which flow not from a project-specific order but from the incentive regulations themselves. Order 679, paragraph 1 says this final rule promotes infrastructure development, provides incentives for infrastructure development. Section 219 of the Federal Power Act says that, yes, it's true. The rules are going to benefit customers, as my friend said, but they're going to benefit customers by promoting infrastructure development. And when you understand incentives to operate in that way, as Judge Randolph said, as flowing from the rule, the regs, and not from a project-specific order, it makes perfect sense to say that everything operated prospectusly. By analogy, there are a lot of laws on the books where your client might benefit from those laws, but you have no assurance of that, for example, until you get an IRS letter. So the fact that you rely on the notion that there was this rule, that isn't enough. But this is in this context because you still have to get the commission to decide that this was the type of project. So you say it's decided it was the type of project, end of discussion, and then the commission comes back and you say this is the inappropriate part, as I understand it. One, no notice. Two, it goes back to this pre-Order 679 policy, that it can't pull back in when it says specifically it's not going to require. That's my argument, in a nutshell. Yes, Your Honor, that's precisely it. And I'd close. Counsel mentioned that. No, excuse me. If Mr. Guyer had said, in very plain language, we place no reliance on the fact that we might come to FERC somewhere down the road and seek an order. But we certainly hope we would be successful in obtaining that order. Is it your position FERC still would have no basis for saying we're only going to approve this for expenses incurred going forward? Yes, that's still our position because that's how the regulation works. It says that if you meet the criteria, and here FERC said at 8 to 9 that we do meet the criteria, you get this particular benefit. They can change that rule for rulemaking if that's what they want to do, but they haven't done so. And as to meet WES, counsel said that nothing in the order there said or remarked on the timing of recovery or anything. That's just simply false. I want to point the court to the language 154 of FERC, paragraphs 61-009, paragraphs 13 and 26. It says that the utility requested, quote, recovery of 100% for prudently incurred costs, including costs related to the project that have been incurred prior to the date of filing. You're looking at 670? First order. Oh, at first order. First order in the meet WES case. Oh. We quote this at the bottom of page 26 of our reply brief. So FERC had said before it issues the orders in this case, many, many times, but most specifically in meet WES, that when you meet the criteria, you get 100% of your costs, including those before the date of the order. Is it your view that that same logic does not apply to the other incentive programs, the sort of relatively categorical idea that you qualify, you get it? Yeah, I think you qualify, you get it, but the you qualify is going to differ for each incentive. And so rate of equity return or quip, one of these other incentives that we've talked about, you might not qualify for some of those under the circumstances. The qualifications in all of them are very high level general, which seems to imply that there's some qualitative judgment, there's some discretion on the part of FERC to say, you know, hypothetical capital structure, that's kind of a big project to, you know, grant that and make it up, say you're the kind of entity that's going to benefit from that. And, yes, it's an incentive, and, yes, it's written in the rule, but nobody is actually incentivized by it unless and until they get some kind of confirmation from FERC that they are going to have that branch rank. And why wouldn't we assume that all of these have sort of a parallel operation like that? You have to check in and get the okay. Well, I think there are two responses to that. The first is that there's a difference between hypothetical capital structure and the abandonment incentive, which is for the abandonment incentive, the rate of recovery, the benefits you get is defined right in the rule, right, 100%, right? For rate of equity or hypothetical capital structure, it's more sort of amenable to a case-by-case decision of the structure of the benefit. But the other point is that on the front end, FERC has tremendous discretion in deciding, does this benefit, is it tailored to the risks and challenges faced in developing this project? There's a lot of discretion there. I'll acknowledge that. But once they've made the decision that an incentive is tailored to the risks of the project that they made here, you get the prescribed benefit. So we're not trying to take any discretion away from the agency. So what if it's not your position that they could have come up with this policy that they're now claiming the sort of instinct in the rule all along? You're not saying, yeah, they could have come up with it, but they just didn't do it clearly enough before we came along. Your position is that the regulation contradicts the policy they now claim to have. We make both of those arguments. You do make both of those arguments. The latter is the one we really rely on, is what they're trying to do here contradicts the reg. But at a minimum, even if you disagree with us on that, what they're saying here contradicts what they did in over 3,000 cases for a decade. And that's the pages 25 to 26 of our reply brief, which maybe, I guess, brings it home to your question about the remedy. It seems like a very different remedy, depending on which ground one might rule on. Yeah, right, exactly. But I think in either case, we get what FERC, at a minimum, has been doing in over 36 cases over a decade here, which is 100% recovery of all of our costs. We think the rules require that, but at a minimum, their precedent requires it. And they departed with that explanation here from their past clients. All right, thank you. We'll take the case under advisement. Thank you very much.
judges: Rogers, Pillard, Randolph